**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS
OF THE NAACP, *et al*.,
P.O. Box 101060
Fort Lauderdale, FL 33310

Plaintiffs,

v.

LAUREL M. LEE, *et al*.,
R.A. Gray Building
500 South Bronough Street
Tallahassee, FL 32399

Defendants.

Misc. No.

Underlying Action: No. 4:21-cv-00187-MAF
U.S.D.C. N.D. Fla.

---

## NON-PARTY HERITAGE ACTION FOR AMERICA'S MOTION TO QUASH SUBPOENA AND/OR MOTION FOR PROTECTIVE ORDER

Heritage Action for America, Inc. ("Heritage Action"), a non-party to the above-styled action, files this Motion to Quash Plaintiffs, Florida State Conference of Branches and Youth Units of the NAACP, Common Cause, Disability Rights Florida, and Florida Rising Together, *et. al*.'s (together, the "Plaintiffs"), subpoena issued October 6, 2021 pursuant to Federal Rules of Civil Procedure 45(d)(3) and 26(c)(1), for the reasons stated in its accompanying Memorandum filed herewith, and in support thereof states:

1

**Factual and Procedural Background**

1.      The above-styled action and the instant Motion arise from an action pending in the Northern District of Florida bearing case number 4:21-cv-00187-MW-MAF (the "Northern District Action").[1]

2.      Plaintiffs issued a subpoena duces tecum on August 6, 2021 (the "Document Subpoena") in the Northern District Action. Exhibit C.  Heritage Action served timely objections and thereafter, Plaintiffs filed a motion to compel, first in the Northern District, which was dismissed, and then in the Southern District. After the Southern District court granted the motion to compel, Heritage Action served responsive documents upon Plaintiffs on October 29, 2021.

3.      While the motion to compel on the Document Subpoena was pending, on October 6, 2021, Plaintiffs issued another subpoena in the Northern District Action, requiring non-party Heritage Action to appear for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) and testify to seven (7) comprehensive topics (the "Deposition Subpoena") on October 20, 2021. The Deposition Subpoena indicates that the place of the deposition is West Palm Beach, Florida, by remote means. Exhibit A.

4.      The topics set forth in the Deposition Subpoena include:

---

[1] Heritage Action brings this Motion in this District because it is located within this District and while the subpoena at issue identifies 319 Clematis Street, Suite 107, West Palm Beach, Florida as the place where the remote deposition will take place, the Southern District of Florida dismissed Heritage Action's motion to quash without prejudice. *See* Federal Rule of Civil Procedure 45(d)(3)(A); Exhibits A and B hereto. Furthermore, this Motion is timely as it was made in the Southern District before the time indicated in the subpoena for compliance, which was October 20, 2021. *See* Fed. R. Civ. P. 45, Rules and Commentary; *U.S. ex rel. Pogue*, 238 F.Supp.2d 270, 278, 278 n.6 (D.D.C. 2002) (citation omitted) (reasonable to assume that the motion to quash should be brought before the noticed date of the scheduled deposition).

a.  All communications from January 2019 to present regarding [Florida] Senate Bill 90 between Heritage Action and any one or more Florida government officials including the Florida Legislature, the Florida Department of State, the Florida Governor's Office, the Florida Attorney General's Office, and any Florida Supervisor of Elections;

b.  All communications from January 2019 to present regarding Heritage Action's efforts to promote or advance legislation related to elections in Florida, including without limitations communications between Heritage Action and any one or more of the following: Defendant-Investors; the Republican National Committee; the National Republican Senatorial Committee, the National Republican Congressional Committee; and any Republican Florida state or local officials;

c.  All lobbying activities from January 2019 to present related to SB 90 that were, or that are continuing to be, conducted, organized, or supported by Heritage Action;

d.  All activities of Karen Jaroch, Gulf States Regional Coordinator for Heritage Action, related to SB 90, from January 2019 to present;

e.  All activities of Jennifer Butler, on behalf of Heritage Action, related to SB 90, from January 19 to present;

f.  All analysis Heritage Action has conducted or received regarding the anticipated or actual effects of SB 90…and;

g.  Heritage Action's collection and production of documents in response to Plaintiffs' Requests for the Production of Documents served on Heritage Action in the Northern District Action on August 6, 2021…

5.       Heritage Action was served with a copy of the Deposition Subpoena on October 7, 2021. A true and correct copy of the return of service is attached hereto as Exhibit D.

6.       Heritage Action filed a motion to quash in the Southern District of Florida prior to the date for compliance. A true and correct copy of the motion is attached hereto as Exhibit E.

7.       The judge dismissed the motion without prejudice on the basis that it was not the appropriate forum to entertain the motion. Exhibit B at 2.

8.       Heritage Action was, at the time of service, left with just thirteen days to identify a corporate representative(s) and prepare such representative(s) for a deposition covering two years of communications on Florida Senate Bill 90 (SB 90")[2] with numerous individuals, two years of lobbying activity related to SB 90, two years of two different individuals' activities related to SB 90, several years of analysis concerning SB 90.

9.       Moreover, the Deposition Subpoena fails to comply with the essential requirements set forth in Federal Rule of Civil Procedure 45 by failing to specify a place where compliance is required or provide a reasonable time to comply.

10.      The Deposition Subpoena also raises serious unanswered questions, including how Plaintiffs, whom Heritage Action believes intend to take Heritage Action's deposition from West Palm Beach, FL intend to swear in Heritage Action's corporate representative if the representative is to answer questions from a remote location, presumably Washington, DC.

11.      The deposition testimony elicited under the Deposition Subpoena cannot, under the designated topics, be said to be relevant.

---

[2] In May 2021, the Florida legislature enacted Florida Senate Bill 90, a voting reform law which contains, among other provisions, a requirement that voters requesting a vote by mail ballot provide a driver license number, identification card, or the last four digits of their social security number to receive a ballot, modification of ballot drop box locations, availability and operating hours.

12.     Finally, the deposition testimony is privileged under the First Amendment.

13.     Heritage Action moves, in addition, for a protective order that, if and when it is compelled to give testimony, it is not required to testify as to any internal analysis, strategy, or regarding communications not relating to SB 90, or regarding communications or activities other than with Florida legislators and their staff.

**WHEREFORE**, Heritage Action for America, Inc. respectfully requests that this honorable Court enter an Order quashing Plaintiffs' Deposition Subpoena dated October 6, 2021 and for a protective order protecting Heritage Action from future similar discovery by Plaintiffs, along with any other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Heidi K. Abegg
Heidi K. Abegg (DC Bar No. 463935)
WEBSTER, CHAMBERLAIN & BEAN, LLP
1747 Pennsylvania Avenue, N.W.
Suite 1000
Washington, D.C. 20006
Telephone: (202) 785-9500
Telecopier: (202) 835-0243

Attorney for Non-Party Heritage Action for America, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of November 2021, I caused a copy of this Motion to Quash, Memorandum in Support, and Proposed Order to be filed electronically with the Clerk of the Court by using the CM/ECF system and a true and correct copy of the same was served by United States Mail and electronic mail upon the following:

P. Benjamin Duke
Shira M. Poliak
Covington & Burling LLP
The New York Times Building 620
Eighth Avenue
New York, NY 10018
pbduke@cov.com

Robert D. Fram
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
rfram@cov.com

Michael Pernick
Morenike Fajana
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
mfajana@naacpldf.org

Michael A. Fletcher II
Benjamin L. Cavataro
Morgan E. Saunders
Elizabeth T. Fouhey
Covington & Burling LLP
850 Tenth Street, N.W.
Washington, DC 20001
bcavataro@cov.com
msaunders@cov.com
efouhey@cov.com
mfletcher@cov.com

Amia Trigg
Mahogane D. Reed
NAACP Legal Defense & Educational Fund, Inc.
700 14th Street NW, Ste. 600
Washington, DC 20005
atrigg@naacpldf.org

Nellie L. King
The Law Offices of Nellie L. King, P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
Nellie@CriminalDefenseFla.com

Mohammad O. Jazil
Gary V. Perko
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
5817 Dahlgren Trial
Tallahassee, FL 32312
mjazil@holtzmanvogel.com

Bradley R. McVay
Ashley E. Davis
Florida Department of State
R.A. Gray Building, Suite 100
500 South Bronough Street
Tallahassee, FL 32399
Brad.mcvay@dos.myflorida.com



/s/ *Heidi Abegg*
Heidi Abegg

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FLORIDA STATE CONFERENCE OF
BRANCHES AND YOUTH UNITS
OF THE NAACP, *et al*.,
P.O. Box 101060
Fort Lauderdale, FL 33310

Plaintiffs,

v.

LAUREL M. LEE, *et al*.,
R.A. Gray Building
500 South Bronough Street
Tallahassee, FL 32399

Defendants.

Misc. No.

Underlying Action: No. 4:21-cv-00187-MAF
U.S.D.C. N.D. Fla.

**NON-PARTY HERITAGE ACTION FOR AMERICA'S MEMORANDUM IN SUPPORT
FOR ITS MOTION TO QUASH SUBPOENA
AND/OR MOTION FOR PROTECTIVE ORDER**

Heritage Action for America, Inc. ("Heritage Action"), a non-party to the above-styled action, files this Motion to Quash Plaintiffs, Florida State Conference of Branches and Youth Units of the NAACP, Common Cause, Disability Rights Florida, and Florida Rising Together, *et. al*.'s (together, the "Plaintiffs"), subpoena issued October 6, 2021 pursuant to Federal Rules of Civil Procedure 45(d)(3) and 26(c)(1), and in support thereof states:

### Factual and Procedural Background

The above-styled action and the instant Motion arise from an action pending in the Northern District of Florida bearing case number 4:21-cv-00187-MW-MAF (the "Northern District Action").[1] Plaintiffs issued a subpoena duces tecum on August 6, 2021 (the "Document Subpoena") in the Northern District Action. Exhibit C. Heritage Action served timely objections and thereafter, Plaintiffs filed a motion to compel, first in the Northern District, which was dismissed, and then in the Southern District of Florida. Pursuant to the Southern District court's order granted the motion to compel, attached as Exhibit B, Heritage Action served responsive documents upon Plaintiffs on October 29, 2021.

While the motion to compel on the Document Subpoena was pending, on October 6, 2021 Plaintiffs issued another subpoena in the Northern District Action, requiring non-party Heritage Action to appear for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6) and testify to seven (7) comprehensive topics (the "Deposition Subpoena") on October 20, 2021. The Deposition Subpoena indicates that the place of the deposition is West Palm Beach, Florida, by remote means. Exhibit A.

The topics set forth in the Deposition Subpoena include:

1.  All communications from January 2019 to present regarding [Florida] Senate Bill
    90 between Heritage Action and any one or more Florida government officials

---

[1] Heritage Action brings this Motion in this District because it is located within this District and while the subpoena at issue identifies 319 Clematis Street, Suite 107, West Palm Beach, Florida as the place where the remote deposition will take place, the Southern District of Florida dismissed Heritage Action's motion to quash without prejudice. Exhibits A and B hereto; *see* Fed. R. Civ. P. 45(d)(3)(A). This Motion is timely as it was made in the Southern District before the time indicated in the subpoena for compliance, which was October 20, 2021. *See* Fed. R. Civ. P. 45, Rules and Commentary; *U.S. ex rel. Pogue*, 238 F.Supp.2d 270, 278, 278 n.6 (D.D.C. 2002) (citation omitted) (reasonable to assume that the motion to quash should be brought before the noticed date of the scheduled deposition).

including the Florida Legislature, the Florida Department of State, the Florida
Governor's Office, the Florida Attorney General's Office, and any Florida
Supervisor of Elections;

2. All communications from January 2019 to present regarding Heritage Action's
   efforts to promote or advance legislation related to elections in Florida, including
   without limitations communications between Heritage Action and any one or more
   of the following: Defendant-Investors; the Republican National Committee; the
   National Republican Senatorial Committee, the National Republican Congressional
   Committee; and any Republican Florida state or local officials;

3. All lobbying activities from January 2019 to present related to SB 90 that were, or
   that are continuing to be, conducted, organized, or supported by Heritage Action;

4. All activities of Karen Jaroch, Gulf States Regional Coordinator for Heritage
   Action, related to SB 90, from January 2019 to present;

5. All activities of Jennifer Butler, on behalf of Heritage Action, related to SB 90,
   from January 2019 to present;

6. All analysis Heritage Action has conducted or received regarding the anticipated or
   actual effects of SB 90…and;

7. Heritage Action's collection and production of documents in response to Plaintiffs'
   Requests for the Production of Documents served on Heritage Action in the
   Northern District Action on August 6, 2021…

Heritage Action was served with a copy of the Deposition Subpoena on October 7, 2021. A
true and correct copy of the return of service is attached hereto as Exhibit D. Heritage Action filed
a motion to quash in the Southern District of Florida prior to the date for compliance. A true and

correct copy of the motion is attached hereto as Exhibit E. The judge in the Southern District dismissed the motion without prejudice on the basis that it was not the appropriate forum to entertain the motion. Exhibit B at 2.

Heritage Action was, at the time of service, left with just thirteen days to identify a corporate representative(s) and prepare such representative(s) for a deposition covering two years of communications on Florida Senate Bill 90 (SB 90")[2] with numerous individuals, two years of lobbying activity related to SB 90, two years of two different individuals' activities related to SB 90, several years of analysis concerning SB 90.

Moreover, the Deposition Subpoena fails to comply with the essential requirements set forth in Federal Rule of Civil Procedure 45 by failing to specify a place where compliance is required or provide a reasonable time to comply. The Deposition Subpoena also raises serious unanswered questions, including how Plaintiffs, whom Heritage Action believes intend to take Heritage Action's deposition from West Palm Beach, FL intend to swear in Heritage Action's corporate representative if the representative is to answer questions from a remote location, presumably Washington, DC.

Finally, the subpoena imposes an undue burden on Heritage Action by seeking deposition testimony of irrelevant and First Amendment privileged matters and fails to meet the framework set out under *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981).

---

[2] In May 2021, the Florida legislature enacted Florida Senate Bill 90, a voting reform law which contains, among other provisions, a requirement that voters requesting a vote by mail ballot provide a driver license number, identification card, or the last four digits of their social security number to receive a ballot, modification of ballot drop box locations, availability and operating hours.

4

**<u>Legal Standard</u>**

As a threshold matter, Federal Rule of Civil Procedure 45(d)(3)(A) confers jurisdiction to quash a subpoena on the court for the district where compliance with the subpoena is required. Although the subpoena fails to specify a location for compliance within this Court's jurisdiction, the court with jurisdiction over the only location specified in the subpoena (West Palm Beach, Florida) has held that it is not the appropriate forum to entertain a motion to quash. Exhibit B at 2. Therefore, Heritage Action moves this Court to quash the subpoena or in the alternative, issue a protective order.

Federal Rule of Civil Procedure 45(a)(1) governs the form and contents for every subpoena issued under the Federal Rules of Civil Procedure. Rule 45(a)(1)(iii) requires every subpoena to provide for some action at *a specified time and place*. The specified place for a deposition is especially relevant under Federal Rule of Civil Procedure 28(a)(1), which dictates before whom depositions may be taken. Pursuant to Rule 28(a)(1)(A)-(B), a deposition must be taken before an officer authorized to administer oaths either by federal law or by the law in the place of examination or a person appointed by the court where the action is pending to administer oaths and take testimony.

The Deposition Subpoena is deficient in form and content. The form and content requirements of a subpoena issued under Federal Rule of Civil Procedure 45 are clear: each subpoena must specify a time *and place* for compliance. Fatally, the Deposition Subpoena gives a time but fails to specify a place within 100 miles of Heritage Action. The Deposition Subpoena states that the deposition will be conducted via remote means in West Palm Beach. Heritage Action was incorporated in, and its principal place of business is located in, Washington, DC, well over 100 miles from West Palm Beach. *See* Exhibit F at ¶¶ 3-4. The Deposition Subpoena fails to

designate a place where Heritage Action can be required to appear, or provide for the administration of an oath to Heritage Action by an "officer authorized to administer oaths either by federal law or by the law in the place of examination . . . or a person appointed by the court where the action is pending to administer oaths and take testimony." Fed R. Civ. P. 28(a)(1)(A)-(B); *See Wultz v. Bank of China, Ltd*., 304 F.R.D. 38, 43 (D.D.C. 2014) (court noting that nothing in Rule 45 indicates nonparty would be deposed anywhere other than the address listed on the face of the subpoena). Even if the Deposition Subpoena had designated a place where Heritage Action can be required to appear, Heritage Action declines to give an oath by remote means, as it is permitted to do. Fla. Stat. § 117.231(3).

In dismissing Heritage Action's motion to quash without prejudice, the Southern District court ignored the West Palm Beach location listed on the subpoena by finding that Heritage Action "is to answer questions from a remote location, *presumably* Washington, DC." Exhibit B at 2 (emphasis added). The court presumed the location even though the subpoena clearly states that it will be conducted via remote means in West Palm Beach, more than 100 miles from Heritage Action's office.

This matter is unlike other cases where Rule 45 subpoenas for remote depositions have been upheld on the basis that a remote deposition takes place where the deponent is located. In *United States v. $110,000 in U.S. Currency*, 2021 U.S. Dist. LEXIS 108951 at *8-9 (N.D. Ill. 2021), the non-party's noticed place for the remote deposition was the Office of the United States Attorney – the same city in which the non-party resided. *See also In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 2311719, at *4 (E.D. La. May 26, 2017) (noting that a subpoena for contemporaneous video testimony falls within Rule 45(a) when the witness is asked to testify at a location within 100 miles of his home or place of business). Conversely, the subpoena

at issue here notices the remote deposition for West Palm Beach, rather than any place within a 100-mile limit of Heritage Action. As a result, the subpoena is deficient because it fails to specify not just a location, but any location within 100 miles of Heritage Action. Therefore, it must be quashed.

If the Court finds the subpoena is not fatally deficient, the Court must still quash the subpoena. Federal Rule of Civil Procedure 45(d)(3) guides the Court in determining whether to quash a subpoena. Specifically, Rule 45(d)(3)(A) states

> On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
>
> (i)     Fails to allow for a reasonable time to comply;
> (ii)    Requires a person to comply beyond the geographical limits specified in Rule 45(c)
> (iii)   Requires disclosure of privileged or other unprotected matter, if no exception or waiver applies; or
> (iv)    Subjects a person to undue burden.

Several factors are pertinent to whether a subpoena would impose an undue burden, including the admissibility or relevance of the information requested, the need of the party, the particularity described, and the burden imposed. *Dell Inc. v. Decosta*, 233 F. Supp.3d 1, 3 (D.D.C. 2017) (citations omitted). In assessing whether a burden is undue, a court will look at the factors articulated in Rule 26(b). *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007). Rule 26 generally limits discovery to any non-privileged matter that is relevant to any party's claim or defense and is proportional to the needs of the case. Rule 26(b)(2) requires a court to limit discovery if the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive, or if the discovery is not relevant to any party's claim or defense and proportional to the needs of the case, taking into account the importance of the issues at stake in the action, and whether the burden or expense of

the proposed discovery outweighs its likely benefit. *BuzzFeed, Inc. v. Dept. of Justice*, 318 F. Supp. 3d 347, 356 (D.D.C 2018). Non-party status is another factor that weighs against compelling disclosure. *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 52 (D.D.C. 2005) (Nonparty status is relevant in considering the burden); *Watts*, 482 F.3d at 503, 308 (Rule 45 undue burden standard requires district courts to be generally sensitive to the costs imposed on third parties). If a subpoena imposes an undue burden, a court has the affirmative duty to "quash or modify" the subpoena. Fed. R. Civ. P. 45(d)(3)(A). Federal Rule of Civil Procedure 26(c) permits a court to enter a protective order, where an entity from which discovery is sought shows good cause to protect against annoyance, embarrassment, oppression, or undue burden or expense.

## Argument

### I.      The Deposition Subpoena Does Not Provide a Reasonable Time to Comply

What constitutes a reasonable time within the meaning of Rule 45 depends on the circumstances of the case. "[R]easonableness seems to be related to the extent of the materials requested and the other underlying circumstances of the particular case." 9A Fed. Prac. & Proc. Civ. §2463.1 (3d ed.); *see also Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 25 (D.D.C. 2005) (finding 29 days is enough time to comply with subpoenas for document depositions only). Heritage Action recognizes that other courts have found fourteen days *from the date of service* to be presumptively reasonable. *See Iconlab Inc. v. Valeant Pharms. Int'l*, 310 F.Supp.3d 3, 5 (D.D.C. 2018). However, thirteen days is not reasonable in this case given the extent of the materials requested and the other underlying circumstances of the case to enable Heritage Action to sufficiently prepare for a deposition and testify truthfully.

The Court must look to the particular facts of the circumstances of this case in making its determination as to whether thirteen days is reasonable here. The Deposition Subpoena was served

while the Plaintiffs and non-party Heritage Action were litigating Plaintiffs' motion to compel. During the pendency of the motion to compel briefing, Heritage Action had not yet conducted a full search for documents and therefore could not prepare deponent(s) to testify about these documents. Further, the Deposition Subpoena added two additional categories not covered by the Document Subpoena, thus requiring Heritage Action to conduct additional document searches in order to adequately prepare deponent(s).

Moreover, Plaintiffs are not asking Heritage Action to testify as to readily ascertainable issues. Rather, Plaintiffs are asking Heritage Action to designate an individual to review sufficiently to provide testimony regarding two years of the entire organization's communications with various legislators and political actors concerning SB 90. In addition, a representative must testify regarding "[a]ll lobbying activities from January 2019 to present related to SB 90 that were, or that are continuing to be, conducted, organized, or supported by Heritage Action for America." Ex. A at ¶3. Furthermore, Heritage Action's representative(s) will need to testify as to the "activities" of two individuals and potentially over two years of data on SB 90's effect on voting rights. Plaintiffs are also demanding testimony regarding "[a]ll analysis Heritage Action for America has conducted *or received* regarding the anticipated or actual effects of SB 90." *Id*. at ¶6 (emphasis added). These topics go beyond communications with "key legislators" but delve into activities and communications with non-government actors, and internal documents analysis. As discussed below, these topics are not only irrelevant and privileged, but their sheer breadth demonstrate that thirteen days is an unreasonable time for preparation given the facts of this case.

Unlike other cases where a nonparty was required to testify mostly as to financial or factual issues, Heritage Action is being asked to testify mostly as to nebulous "communications" and

"activities" with large organizations compromised of many employees and agents. For example, Heritage Action must prepare a witness to testify about

> [a]ll Communications from January 2019 to present regarding Heritage Action for America's efforts to promote or advance legislation related to elections in Florida, including without limitation Communications between, on the one hand, Heritage Action for America and, on the other hand, any one or more of the following: Defendant-Intervenors; the Republican National Committee; the National Republican Senatorial Committee; the National Republican Congressional Committee; and any Republican Florida State or local officials." Ex. A at ¶2.

This topic covers not just SB 90, but any legislation related to elections since 2019, and communications with unnamed and unknown employees and agents. While Heritage Action produced documents on October 29, 2021 in response to the Document Subpoena, Topic 2 described above was not covered in the Deposition Subpoena and will necessitate a burdensome search and preparation.

Plaintiffs are requesting that Heritage Action designate a representative(s) to undertake the Herculean task of processing years' worth of subjective information and communications with large organizations in less than two calendar weeks. This is unreasonable on its face. Preparation for Topic 2 of the Subpoena alone will require a search for documents regarding "efforts to promote or advance legislation related to elections in Florida" (not just SB 90) *and* communications with the Republican National Committee, the National Republican Senatorial Committee; and the National Republican Congressional Committee ("Party Committees"), entities regarding which there were no requests in the Document Subpoena. *See* Affidavit of Jessica Anderson, attached hereto as Exhibit F, at ¶ 12. By way of reminder—because it bears repeating—this search for documents and communications with which a Heritage Action representative will then need to become sufficiently familiar requires looking back two (2) years to 2019. The scope of Plaintiffs' requests could encompass communications between various Heritage Action

employees and potentially *hundreds* of unnamed politically minded individuals linked to any legislation "related to elections in Florida." *See, e.g., Rockstar Consortium US LP & Netstar Techs. LLC v. Google, Inc.*, 2015 U.S. Dist. LEXIS 139770, *19-21 (D. Mass. Oct. 14, 2015) (finding the discovery rules do not permit a party to begin with broad burdensome subpoenas and only then proceed to target specific, relevant information, especially when non-parties are involved). Thirteen days does not provide adequate time to gather all of the requested information, determine if those communications are with individuals associated with the political actors, let alone prepare to testify as to same.

## II. The Deposition Subpoena is Unduly Burdensome and the Information it Seeks is Irrelevant to the Needs of the Case

To determine whether a subpoena is unduly burdensome, courts apply the general discovery standard, under which parties may discover any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(2); *Gouse v. District of Columbia*, 359 F. Supp. 3d 51, 56 (D.D.C. 2019). While the person objecting to production has a heavy burden to show that the subpoena should not be enforced, parties and attorneys who issue subpoenas have an affirmative duty to prevent undue burden or expense to the persons subject to the subpoena. *Millennium TGA, Inc. v. Comcast Cable Communications LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012) (citations omitted).

In its second bite at the subpoena apple, Plaintiffs demand testimony on broad topics, including on topics not covered by the Document Subpoena, thus requiring Heritage Action to undertake a second document search prior to preparing a representative. As such, Plaintiffs have not met their duty to prevent undue burden or expense on Heritage Action. As to those topics already covered by the Document Subpoena, Plaintiffs seek "unreasonably cumulative or duplicative" discovery. Fed. R. Civ. P. 26(b)(2)(C); *see BuzzFeed*, 318 F. Supp. 3d at 356.

11

Proportionality requires counsel and the court to consider whether relevant information is discoverable in view of the needs of the case. In making this determination, the Court is guided by the non-exclusive list of factors in Rule 26(b)(1). *See Hesco Bastion Ltd v. Greenberg Traurig LLP*, 2009 U.S. Dist. LEXIS 124079, at *3 (D.D.C. Dec. 23, 2009) (noting that Rule 26's limits on discovery also apply to the scope of a subpoena); *see also Watts*, 482 F.2d at 507.  Any application of the proportionality factors must start with the actual claims and defenses in the case, and a consideration of how and to what degree the requested discovery bears on those claims and defenses.

In May, Florida enacted a voting reform law which contains, among other provisions, a requirement that voters requesting a vote by mail ballot provide a driver license number, identification card, or the last four digits of their social security number to receive a ballot, modification of ballot drop box locations, availability and operating hours. Plaintiffs have sued the Florida Government alleging in part, that Florida's law obstructs voting access and disproportionately impacts the ability of Black voters, Latino voters, and voters with disabilities to cast their ballot in violation of the Voting Rights Act, the U.S. Constitution, and the Americans With Disabilities Act. In support, Plaintiffs allege that the passage of the Florida law deviated from the "usual legislative process." Plaintiffs further contend that both chambers rejected the vast majority of amendments that would have mitigated alleged discriminatory impacts of the proposed legislation. According to Plaintiffs, these allegations create a totality of the circumstances surrounding the enactment of the law that burdens the right to vote and disproportionately harms voters. Plaintiffs also allege that Florida has no legitimate interest in the challenged provisions that justify the burdens imposed.

Plaintiffs argue that Heritage Action was extensively involved in pushing for state legislation and therefore the specifics of its activities and interactions could shed light on the motives of the Legislature in enacting SB 90; reveal SB 90 proponents' understanding of the bill's likely impact on voters and provide evidence of intentional discrimination or motivations to discriminate. Plaintiffs have also claimed that Heritage Action's documents are material to the intent and knowledge of the Florida legislature. Plaintiffs have asserted that they need to understand whether, and to what extent, legislators who supported SB 90 relied on Heritage Action. However, Plaintiffs do not demonstrate, nor can they, how Heritage Action's communications or activities can provide any insight into whether and to what extent, legislators relied upon them. That is knowledge that only the legislators possess. Further, Plaintiffs have no basis for demanding testimony regarding Heritage Action's communications with the Party Committees, who are not even part of the legislative process. The standard of relevancy is "not so liberal as to allow a party to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1012-13 (D.C. Cir. 1997) (quotation omitted).

Plaintiffs certainly roam in the shadow zones of relevancy by requesting "[a]ll analysis Heritage Action for America has conducted *or received* regarding the anticipated or actual effects of SB 90", especially if such analysis has not been communicated with Florida legislators but only received by Heritage Action. Ex. A at ¶6 (emphasis added). Likewise, Heritage Action's communications with non-government officials -- organizations in the political sphere – cannot determine the legislative intent of SB 90 and are not relevant to whether the Legislature rushed the process, whether enacted SB 90 imposes restrictions on the right to vote, whether Florida's

implementation and enforcement will unreasonably burden voters, or whether Florida's proffered interest is legitimate and sufficient.[3]   Heritage Action's "lobbying activities" have no relation whatsoever to what occurred during the legislative process, any analysis into the enacted law's restrictions on the right to vote, the implementation and enforcement of that law, or whether Florida's interest is legitimate.   To the extent the Legislature's motive or intent is relevant to any of these claims, it does not follow that Heritage Action's lobbying activities or intent is probative of the Legislature's intent or to whether Florida has a legitimate interest in the law.   *See Primary Care Physicians Group, P.C. v. Ledbetter*, 102 F.R.D. 254, 256-257 (N.D. Ga. 1984) (denying discovery of non-party's lobbying efforts in support of legislation alleged to be unconstitutional); *Apel v. Murphy*, 70 F.R.D. 651 (D.R.I. 1976) (denying discovery of non-party reporters on grounds that any illegitimate reason the legislature may have had for passage of the law was irrelevant to the determination of whether a valid purpose existed). Instead, testifying on these topics would frustrate Heritage Action's ability to pursue its legislative and policy goals by "revealing to their opponents 'activities, strategies and tactics.'" *AFL-CIO v. FEC*, 333 F.3d 168, 177 (D.C. Cir. 2003).

In *Brnovich v. Democratic National Committee*, the Supreme Court reviewed whether the Court of Appeals erred in concluding that Arizona's voting rights law was enacted with a discriminatory purpose. No. 19-1257, slip op. at 34 (July 1, 2021).   The Supreme Court noted that the district court had applied the familiar approach, namely, consideration of the historical background and the sequence of events leading to the bill's enactment, departures from the normal

---

[3] Plaintiffs, in the Northern District Action, allege that the Florida Legislature deviated from procedural norms in rushing SB 90 to passage and that the legislators who introduced, sponsored, and voted to enact SB 90 were on notice of SB 90's allegedly disparate impact on Black and Latino voters in Florida.

legislative process, consideration of relevant legislative history, and weighing of the law's impact on different racial groups.  *Id*. at 35 (citations omitted).  The Supreme Court found that the "cat's paw" theory has no application to legislative bodies:

> The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents.  It is insulting to suggest that they are mere dupes or tools.

*Id*. at 37.  Plaintiffs are arguing a "cat's paw" theory here, namely that Heritage Action's intent is probative of the "Legislature's intent" and that the subject of communications to legislators are imputed to them.  *Brnovich* requires this Court to reject that theory and as a result, testimony about Heritage Action's communications with government officials cannot be relevant to Plaintiffs' claims.  Without any discovery of the legislators themselves, there is no basis upon which to conclude that anything in communications between Heritage Action and government officials were considered, relied upon, or even read. Heritage Action is simply one organization out of many that may have discussed voter reform policies with Florida legislators and communications are no more relevant than those of any other citizen or organization that petitioned the Legislature. Heritage Action's activities and communications with entities other than Florida legislators have even less relevance.

Heritage Action's communications are also not relevant to the claim that the law lacks a legitimate interest. *See Daniel v. Family Security Life Insurance Co.*, 336 U.S. 220, 224 (1949) ("It is said that the 'insurance lobby' obtained this statute from the South Carolina legislature. But a judiciary must judge by results, not by varied factors which may have determined legislators' votes."); *Ledbetter*, 102 F.R.D. 257 (finding non-party's lobbying documents were irrelevant to whether there is any conceivable purpose which may justify the statute). "Whether labeled motive

or purpose, an inquiry of reporters into the public statements of lobbyists and state officials relative to their reasons for supporting said legislation has no place in the instant action." *Apel*, 70 F.R.D. at 654.  The rulings in these cases apply with equal force to Plaintiffs' arguments in this case and require granting of the motion to quash. How can the motives or intent of Heritage Action be relevant to a legitimate interest inquiry when the Supreme Court has said that the Florida legislators cannot be agents of proponents of the bill?

Nor is testimony from Heritage Action relevant simply because its activities are *about* voting reform – the subject of the lawsuit.  Communications between Heritage Action and non-government officials, namely the Republican National Committee, the National Republican Senatorial Committee, the National Republican Congressional Committee, any Republican Florida State or local officials, about general "efforts to promote or advance legislation related to elections in Florida" – not limited to SB 90 – are not probative of whether the Legislature acted with an unconstitutional purpose.  Under this rationale, Plaintiffs could seek discovery from any individual or group that promotes or advances legislation, without regard to whether these communications were even with the very legislators considering the legislation. How can Plaintiffs credibly divine what influenced the legislators by looking to communications between non-parties?

In ruling on the Document Subpoena motion to compel, the Southern District court judge agreed that "it would be improper for the Court to conclude that the goals and positions of Heritage should be imputed to the Legislature and to admit the documents Plaintiffs request as revealing that intent." Ex. G at 4-5. However, the court also said that "documents reflecting communications between Heritage and *key legislators* involved in the passage of Senate Bill 90 certainly constitute 'circumstantial . . . evidence of intent'". *Id*. at 5 (emphasis added). Without conceding that any communication with key legislators is circumstantial evidence of intent, it does not automatically

follow that Heritage Action's communications with the Florida Department of State, the Florida Governor's Office, the Florida Attorney General's Office, any Florida Supervisor of Elections, the Republican National Committee, the National Republican Senatorial Committee, the National Republican Congressional Committee, and any Republican Florida State or local officials – none of whom are key legislators – also constitute circumstantial evidence of legislative intent.

Heritage Action is not a Florida legislator, and Heritage Action cannot speak to the Florida Legislature's intent in enacting SB 90. There is not one person who Heritage Action could designate to speak to the general intent of the Florida Legislature. To the extent that Plaintiffs require insight into that intent, they must turn directly to individual members of the Legislature. Heritage Action suspects that Plaintiffs are avoiding doing so because it is easier to engage in a fishing expedition with a private nonparty than to engage with government officials. Plaintiffs have complained that to obtain documents from 15 legislators will take time and cost more than $9,000.00. *See* Ex. H at 14. To the extent that Plaintiffs' complaints are true, this time and money is part and parcel of filing and pursuing a lawsuit. Plaintiffs should not be permitted to shift their burden of preparing their case onto Heritage Action merely because Plaintiffs would prefer to save the time and expense. For all of these reasons, responding to the subpoena would not be "proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).

Rule 26(b)(2) also requires a court to limit discovery if the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome, or less expensive.  To an extent, the discovery sought under the Deposition Subpoena is cumulative to the discovery sought under the Document Subpoena, and moreover, it can be obtained from more convenient sources. The Deposition Subpoena essentially asks for Heritage Action to talk through the documents it has produced in accordance with the

Documents Subpoena, and then some -- due to the additional request regarding communications with members of three political party organizations that are not themselves legislative bodies.[4] With respect to other sources, in addition to seeking this discovery from the legislators themselves, Plaintiffs could also seek communications from any of the Supervisors of Elections that Plaintiffs have named as Defendants in the Northern District Action—and Plaintiffs have named the supervisor of elections for *each and every* county in the state of Florida. Given the myriad alternative sources available to Plaintiffs, the Court should not permit Plaintiffs to strong-arm Heritage Action, a nonparty, into serving as a "catch-all" producer of information. *See BuzzFeed, Inc. v. Dept. of Justice*, 318 F. Supp. 3d 347, 358 (D.D.C. 2018) (citing *Watts*, 482 F.3d at 509 for Rule 26(b) factors including whether discovery sought can be obtained from some other source that is more convenient, less burdensome, or less expensive).

Plaintiffs demand testimony privileged under the First Amendment.  The Constitution guarantees a right to engage in activities that the First Amendment protects, including the right to petition the government, the right to associate, and the right of speech.  The right to petition entitles citizens to communicate with their government officials to express ideas and concerns. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388-89 (2011).  "[P]etitioning the government is equally central to First Amendment values." *Wyoming v. United States Dep't of Agric.*, 208 F.R.D. at 454 (D.D.C. 2002); *see also United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) (holding the right to petition government is "among the most precious of the liberties safeguarded by the Bill of Rights"). This right incorporates the right to associate with others in a

---

[4] Heritage Action states it would require at least six business days to search for and review documents, confer with Karen Jaroch and with Jennifer Butler regarding all of their activities concerning SB 90 on behalf of Heritage Action since January 2019, and then prepare a witness or witnesses to testify.  Exhibit E at ¶ 16.

joint effort to convince the government to take particular actions. *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (citation omitted). First Amendment protections apply in the context of discovery as well because the compelled disclosure of affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation. *AFL-CIO v. FEC*, 333 F.3d 168, 175-76 (D.C. Cir. 2003) (citing *Buckley v. Valeo*, 424 U.S. 1, 64-68 (1976)); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958)). "[T]he Supreme Court has recognized that in the context of discovery, the First Amendment creates a qualified privilege against disclosure of certain associational information." *In re Motor Fuel Temperature Sales Practice Litigation*, 707 F. Supp. 2d 1145, 1152 (D. Kansas 2010) (citing *NAACP v. Alabama*, 357 U.S. at 462). The First Amendment provides a privilege against compelled disclosure of information through any mode of discovery where the intent or practical effect of enforcing it would chill the rights of speech, association, and petition. *NAACP v. Alabama*, 357 U.S. at 466. A greater showing of relevance and need is required where First Amendment issues are at stake in order to give more protection to First Amendment values. *Austl. E. USA Shipping Conf. v. United States*, 537 F. Supp. 807, 810, 812 (D.C. Cir. 1982). When a claim of associational privilege is asserted, the relevance standard is more exacting than the minimal showing of relevance under Rule 26(b)(1), and the information must go to the heart of the matter. *State of Wyoming v. United States of Dep't of Agric.*, 239 F. Supp. 2d 1219, 1241 (D. Wyo. 2002), *vacated as moot*, 414 F.3d 1207 (10th Cir. 2005); *In re Motor Fuel*, 707 F. Supp. 2d at 1152 (applying a burden-shifting analysis).

Demanding discovery from a policy organization like Heritage Action strikes at "the essence of First Amendment freedoms – the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest." *Wyoming v. U.S. Dept. of Agriculture*, 208 F.R.D.

19

449, 454 (D.D.C. 2002) (quotation omitted). The First Amendment protects "not only the organization itself, but also [] its staff, members, contributors, and others who affiliate with it." *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978). "Membership lists are not the only information afforded First Amendment protection." *Wyoming*, 208 F.R.D. at 454. Testifying about Heritage Action's communications with the government and non-government entities, about internal analyses regarding legislative bills and strategies, and about communications *received* from anyone on election reform, would frustrate Heritage Action's ability to pursue its legislative goals by "revealing to their opponents 'activities, strategies and tactics.'" *AFL-CIO*, 333 F.3d at 177.

Compelled testimony from Heritage Action regarding its communications with government actors, and especially with non-government actors, would chill Heritage Action's First Amendment rights of speech, of association, and to petition government. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958). Even though a subpoena may not impose an undue financial burden, this Court must still determine whether it violates the First Amendment rights of Heritage Action by prying into its efforts to petition the Government.

In weighing a claim of First Amendment privilege in the discovery context, the Court should conduct a balancing inquiry. *See Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981).[5] "Before granting a motion to compel discovery," the First Amendment claim should be measured against the party's need for the information sought so that the interests of both parties can be protected. *Id.* at 1266; *see also Coalition for App Fairness v. Apple Inc.*, 2021 U.S. Dist.

---

[5] *Vacated as moot Smith v. Black Panther Party*, 458 U.S. 1118 (1982); *see Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 n.6 (D.D.C. 2002) (nothing that "[t]here is no suggestion in later case law in this Circuit that [*Black Panther's*] reasoning or analysis has been rejected or abandoned by our Court of Appeals.").

LEXIS 146526, *5-6 (D.D.C. Aug. 5, 2021) (quoting *Wyoming v. US Dep't of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002)) (when First Amendment privilege against production is asserted, a court must apply a balancing framework and assess whether the information goes to the heart of the lawsuit, whether the party seeking the discovery sought the information through alternative sources, and whether the party seeking discovery made reasonable attempts to obtain the information elsewhere.).   Courts must determine whether litigants seeking disclosure have exhausted every reasonable alternative source of information, and whether the information sought goes to "the heart of the matter." *Id*. at 1268; *International Union, UAW v. National Right to Work Legal Defense & Education Foundation, Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1979) (Before compelling discovery of material implicating the First Amendment in the discovery context, a court must assess whether the information goes to the "heart of the lawsuit.").  "Infringement of First Amendment interests must be kept to a minimum." *Id*.  The balancing under this framework decidedly tips in favor of granting Heritage Action's motion.

Due to the First Amendment issues raised in this case, Plaintiffs are first required to exhaust other avenues before deposing Heritage Action. *See Zerilli v. Smith*, 656 F.2d 705, 714 (D.C. Cir. 1981) (noting that it had required the taking of as many as 60 depositions to be a reasonable prerequisite to piercing the journalistic privilege); *Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9, (D.D.C. 2015) (number of depositions in a journalistic privilege case is determined on a case-by-case basis, "[b]ut where there is a reasonably well-defined number of possible alternative sources for the same information sought," the party seeking to compel must demonstrate reasonable efforts to exhaust those sources); *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004) (quashing subpoena for non-party's communications with current and former elected officials finding insufficient attempts to obtain the information

through other reasonable sources, including deposing the public officials). Plaintiffs simply argue that it is too time consuming, inefficient, and costly for them to seek this information from the legislators themselves.

In an end run around the cost and time to obtain documents from Florida legislators, Plaintiffs have argued it is more efficient to get the documents from the Non-Parties. Ex. H at 13. To permit the Plaintiffs to use non-parties as a source of first resort eliminates the First Amendment privilege and allows discovery to be used as fishing expeditions or tools of harassment. "Because of the preferred position of First Amendment rights, 'compelled disclosure . . . (is) normally the end, and not the beginning, of the inquiry.'" *Black Panther Party*, 661 F.2d at 1268 (*quoting Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981) (citation omitted)); *International Union, UAW v. National Right to Work Legal Defense & Education Foundation, Inc.*, 590 F.2d 1139, 1152-1153 (D.C. Cir. 1979) (although membership list was of central relevance, discovery was denied because plaintiff unions failed to show they had been unable to obtain information from alternative sources). Plaintiffs have not shown that they have exhausted every reasonable alternative avenue for discovery before seeking privileged documents from Heritage Action. *Black Panther Party*, 661 F.2d at 1268 (this showing "must be reasonably explicit."). Otherwise, protected petitioning activity may become public at the drop of a lawsuit. The First Amendment rights of countless organizations would be chilled if every time a law is challenged, it subjects them to non-party discovery requests about their petitioning – and about their communications with non-government entities such as the Party Committees – from their ideological opponents.

Plaintiffs have complained about the cost of obtaining records from and deposing legislators, arguing that to obtain discovery from only 15 legislators they will incur more than $9,000, and therefore, "it is far more efficient for Heritage to produce the requested documents

than for Plaintiffs to propound third-party subpoenas on legislators and their staff" as there are "160 state legislators", making it "far more efficient (and less costly) to obtain those communications from a single source – Heritage." Ex. H at 13-14. Plaintiffs also argue that "[r]egardless of the discovery sought from other non-parties, time is of the essence, as the close of fact discovery in the Underlying Case is set for October 22." Ex. H at 7-8. But Plaintiffs cannot escape their obligation to exhaust alternative sources simply because pursuing these sources is likely to be time-consuming, unproductive, or barred by a discovery deadline. *See Zerilli v. Smith*, 656 F.2d 705, 715 (D.C. Cir. 1981) (stating that party could not escape their obligation to exhaust alternative sources simply because they "feared that deposing Justice Department employees would be time-consuming, costly, and unproductive."); *Burlodge Ltd. v. Standex Int'l Corp.*, 257 F.R.D. 12, 19 (D.D.C. 2009) ("[E]ven modifying the subpoena to seek this limited information is unduly burdensome because of the absence of any showing that the information sought is not available from other sources."); *see also Watts*, 482 F.3d at 509 (courts may consider "whether the discovery sought is 'obtainable from some other source that is more convenient, less burdensome, or less expensive'" (quoting Fed. R. Civ. P. 26(b))). Citing inefficiency is a far cry from the exhaustion required in journalistic and First Amendment privilege cases.[6]

---

[6] *See Zerilli v. Smith*, 656 F.2d 705, 714 (D.C. Cir. 1981) (court noting that in the past, it had required the taking of as many as 60 depositions to be a reasonable prerequisite to piercing the journalistic privilege); *Goldberg v. Amgen, Inc.*, 123 F. Supp. 3d 9 (D.D.C. 2015) (number of depositions in a journalistic privilege case is determined on a case-by-case basis, "[b]ut where there is a reasonably well-defined number of possible alternative sources for the same information sought, "the party seeking to compel must demonstrate reasonable efforts to exhaust those possible sources): *Eugster v. City of Spokane*, 91 P.3d 117, 123 (Wash. Ct. App. 2004) (court quashing subpoena for non-party's communications with current and former elected officials finding insufficient attempts to obtain the information through other reasonable sources, including deposing the public officials).

Where, as in this case, Plaintiffs have failed to exhaust alternative sources, there is no need to consider the remaining portion of the balancing test. *See Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 120 n.4 (D.D.C. 2002) (failure to exhaust alternative sources weighed "so heavily in favor of quashing the subpoena" that court declined to consider the remaining analysis). Even proceeding to the second part of the balancing test or if the Court finds the subpoena will not impose an undue burden, Heritage Action's motion to quash must still be granted because the subpoena violates Heritage Action's First Amendment rights by prying into its internal political affairs and efforts to petition the government.

It is settled that "[b]alancing one party's First Amendment interests against another party's need for disclosure to determine whether a claim of privilege should be upheld or whether discovery should be ordered requires a detailed and painstaking analysis. *Black Panther*, 661 F.2d at 1267. Before compelling discovery of material implicating the First Amendment in the discovery context, a court must assess whether the information goes to the "heart of the lawsuit." *National Right to Work*, 590 F.2d at 1152.

Heritage Action's testimony on the noticed topics would not go to the heart of the matter and is not relevant, even circumstantially, to the Plaintiffs' claims. *See Daniel v. Family Security Life Insurance Co.*, 336 U.S. 220, 224 (1949) ("It is said that the 'insurance lobby' obtained this statute from the South Carolina legislature. But a judiciary must judge by results, not by varied factors which may have determined legislators' votes."); *Primary Care Physicians Group, P.C. v. Ledbetter*, 102 F.R.D. 254, 257 (N.D. Ga. 1984) (finding non-party's lobbying documents were irrelevant to whether there is any conceivable purpose which may justify the statute). Whatever motives or intent Heritage Action has in connection with SB 90 therefore cannot prove or disprove

Plaintiffs' claims[7], and it would be unreasonable to subject Heritage Action to the outsized efforts required to comply with another subpoena that by operation of law would not yield relevant information for Plaintiffs beyond what they would get from Defendants or legislators.

One instructive decision is *Wyoming v. United States Dep't of Agric.*, in which the plaintiff filed a motion to compel against non-parties in a challenge to federal agency actions. 208 F.R.D. 449 (D.D.C. 2002). The court denied production, finding that the non-parties' documents were irrelevant to the plaintiffs' claim that the *government* violated the law because all relevant documents would be in the hands of the federal defendants, and "intrusion into the activities of the non-party witnesses is unwarranted and unnecessarily burdensome." *Id*. That is the case here.

Plaintiffs have tried to minimize Heritage Action's First Amendment interests by claiming that because it has chosen to speak publicly on voting rights, disclosure of these private documents cannot chill its First Amendment rights.  Petitioning activity does not lose its First Amendment protection once communicated to a government official.  *See, e.g., Heartland Surreal Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 19475 (D. Kan. 2007) (refusing to allow discovery of non-party advocacy documents argued to reveal defendants' views and opinions). That Heritage Action has chosen to speak about voting rights in other contexts does not automatically waive any First Amendment privilege here. Communicating with legislators does not waive Heritage Action's First Amendment privilege as to its communications with non-legislators, such as the Party Committees.

---

[7] In addition to communications with the Florida legislature and other Florida government bodies, the Deposition Subpoena commands production of Heritage Actions communications with the Republican National Committee, the National Republican Senatorial committee, the National Republican Congressional Committee, and any Republican Florida State or local officials.  Based on the cited cases, such communications are even less relevant to Plaintiffs' claims.

The First Amendment protects Heritage Action from being required to disclose any responsive documents since it would chill its (a) right to petition the government, (b) freedom of association, and (c) freedom of speech, and Plaintiffs have not shown that the information sought is highly relevant to the claims or defenses in the litigation sufficient to justify this chill, or that the documents would go to the heart of the matter at issue.

### A.      The subpoena impermissibly chills Heritage Action's right to petition

As noted previously, the First Amendment right to petition entitles citizens to communicate with their government officials to express ideas and concerns. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388-89 (2011). "[P]etitioning the government is [] central to First Amendment values." *State of Wyoming v. United States Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002); *see also Austl./E. USA Shipping Conference v. United States*, 537 F. Supp. 807, 809-810 (D.C. Cir. 1982) (court stating "petitioning the government is equally central to first amendment values"). Heritage Action's right of petition is burdened by the subpoena because it requires it to testify about "all lobbying activities," "all communications" with the Florida Legislature, the Florida Department of State, the Florida Governor's Office, the Florida Attorney General's Office, any Florida Supervisor of Elections, the Republican National Committee, National Republican Senatorial Committee, the National Republican Congressional Committee, any Republican Florida State or local officials regarding any efforts to promote legislation "related to elections in Florida," "all analysis" Heritage Action has conducted on SB 90 (whether or not made public), and all activities (whether public or not) of two individuals related to SB 90. These topics include not just public communications and activities, but internal, private communications with non-government entities.  This creates a "reasonable probability" that Heritage Action will then

be "subject … to threats, harassment, or reprisals from either Government officials or private parties," which is impermissible. *See Citizens United v. FEC*, 558 U.S. 310, 367 (2010) (internal quotation marks and citation omitted).  One notable chill of a group's expressive rights is a diminished "effective[ness] in its "advocacy of both public and private points of view." *NAACP*, 357 U.S. at 460.

The threat of harassment based on political views is very real.  President Biden recently noted that harassing tactics used by activists upset over positions taken by senators was "part of the process" and that "it happens to everybody."[8]  Indeed, for Heritage Action, the threat of harassment is far from hypothetical.  Heritage Action receives threatening mail on issues like those in this suit, and even the position of its sister organization The Heritage Foundation, with whom Heritage Action shares a building, on something as anodyne as the annual budget for the federal government drew some 100-200 protesters to storm its lobby.[9]  Shut Down

---

[8] Julie Luchetta, *Activists ambush Sen. Kyrsten Sinema at ASU over immigration, Build Back Better Act*, AZCENTRAL.COM (Oct. 3, 2021), https://www.azcentral.com/story/news/politics/arizona/2021/10/04/activists-ambush-sen-kyrsten-sinema-asu-build-back-better-act/5985790001/ (activists recording Sen. Sinema in the bathroom and yelling at Sen. Manchin in his boat from kayaks); Anders Anglesey, *Kyrsten Sinema Ambushed at Airport by Activist in Viral Video*, NEWSWEEK (Oct. 5, 2021), https://www.newsweek.com/kyrsten-sinema-ambushed-airport-activists-viral-video-1635546 (collecting additional instances of confrontations with activists).

[9] See, e.g., Joshua Eaton, *Protesters storm Heritage Foundation Building to Call for 'Budget for the People,'* THINKPROGRESS (Apr. 25, 2017), https://thinkprogress.org/protests-at-white-house-heritage-foundation-call-for-budget-for-the-people-9bd41cda761c; Melissa Quinn, *Demonstrators Descend on Heritage Foundation to Protest Trump Budget*, THE DAILY SIGNAL (Apr. 25, 2017), https://www.dailysignal.com/2017/04/25/demonstrators-descend-on-heritage-foundation-to-protest-trump-budget; Penny Starr, *Protesters from Chicago Storm Heritage Foundation to Protest Budget Blueprint Shared with President Trump*, BREITBART NEWS (Apr. 25, 2017), http://www.breitbart.com/big-government/2017/04/25/protestors-from-chicago-storm-heritage-foundation-to-protest-budget-blueprint-shared-with-president-trump.

D.C. listed Heritage as a target for disruption if President Trump had won the election.[10] Given these risks of disclosure, Heritage Action is obviously burdened and compliance would chill future petition activity.

Any argument that by publicly talking about voter laws, Heritage Action has either waived privilege as to private communications or its petitioning on the topic cannot be chilled is specious.  "[A]dvocacy for modification of [] laws" is protected by the First Amendment against discovery requests.  *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 WL 852521, at *3 (D. Kan. 2007); *Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989) (First Amendment protects "advocacy concerning the lawful modification or elimination of the federal tax system").  Heritage Action's choice to exercise its free speech rights in the marketplace of ideas does not operate to waive any privilege regarding its other protected speech. Choosing to speak in the public square does not remove the chill to other types of protected activity, *i.e.,* right to petition or the right to associate with others such as the Party Committees. The demand for testimony about Heritage Action's petitioning communications would require the disclosure of the strategies and methods by which it petitions and competes in the marketplace of ideas. To subject a non-party to subpoenas about who and where it communicates severely undercuts the ability of any entity to pursue its right to petition the government.

Plaintiffs demand for Heritage Action's communications concerning the Florida law, especially with non-government entities, is a blatant attempt to harass it for exercising its right to speak about important matters and to petition the government.  The chilling effect

---

[10] See, e.g., Rachel del Guidice, *Shut Down DC Targets Conservative Organizations as 'Trump Boosters',* THE DAILY SIGNAL (Oct. 30, 2020), https://www.dailysignal.com/2020/10/30/shut-down-dc-targets-conservative-organizations-as-trump-boosters/.

is substantial. If organizations and citizens know that they may be deposed because they have petitioned government officials, the chill on core petitioning speech and participation in civic life will be immeasurable.

Plaintiffs' justification that it is "far more efficient (and less costly) to obtain those communications from a single source – the Non-Parties – than to propound discovery demands on a significant number of parties" is also an insufficient to justify the chill on Heritage Action's petition rights. Ex. H at 14.

For all of these reasons, there is far more than an "objectively reasonable probability that compelled disclosure will chill associational rights." *In re Motor Fuel*, 707 F. Supp. 2d at 1153. As such, the motion must be granted.

> **B.      The subpoena impermissibly burdens Heritage Action's freedom of association and speech.**

The subpoena burdens the freedom to associate with other individuals and groups. Heritage Action has a First Amendment right to associate with others in a joint effort to convince the government to act. *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 525 (2002). When a claim of associational privilege is asserted, the relevance standard is more exacting than the minimal showing of relevance under Rule 26(b)(1), and the information must go to the heart of the matter. *State of Wyoming*, 239 F. Supp. 2d at 1241.

In this case, forced disclosure of the subpoenaed documents might inhibit other groups and individuals from associating with Heritage Action. The price of joining forces with Heritage Action would be a fear that, the next time their petitions and other advocacy relates to a challenged law or position, they will be subpoenaed and information about their allies will be revealed. Likewise, donors may fear donating to Heritage Action for fear that

information they give to them will be exposed.[11] The First Amendment protects Heritage Action for this reason as well. *See Citizens United*, 558 U.S. at 367.

Forcing Heritage Action to testify about its lobbying activities, its communications, and its internal documents and analyses on legislation and policies, would have immediate harmful benefits. Heritage Action faces a perpetual threat that private parties will cut off essential services because of its views. For example, groups have experienced boycotts by virtue of their views.[12] While Heritage Action respects the rights of businesses to associate with or disassociate from political causes, it also seeks to protect itself from misquotation or other harm by compelled disclosure of its activities and communications, especially those with non-government entities.

Plaintiffs have argued that because they believe Florida is violating the right to vote and have one's vote counted, Plaintiffs are therefore justified in burdening Heritage Action's First Amendment associational right. This is insufficient.  To justify burdening Heritage Action's rights based on the fact that the Florida law is alleged to have burdened First Amendment rights cuts off the First Amendment's nose to spite its face.

With all this laid bare, Heritage Action believes the Court must protect Heritage Action from Plaintiffs' further using subpoena power to harass Heritage Action for information and testimony that they have already obtained from Heritage Action pursuant to the Document

---

[11] See Heritage Foundation, *Heritage Leaders Help to Reverse Guidestar's 'Hate Group' Annotations for Conservative Groups*, (July 14, 2017)  https://www.heritage.org/impact/heritage-leaders-help-reverse-guidestars-hate-group-annotations-conservative-groups.

[12] *See*, *e.g.*, Shut Down DC, https://www.shutdowndc.org/updates/everything-you-need-to-know-to-defend-democracy-this-week. While Heritage Action was not specifically listed on the target list, the Heritage Foundation, with which Heritage Action shares a building and policy goals, was listed as a target.

Subpoena, or may obtain elsewhere, including from parties to the Northern District Action. Beyond the burden described herein, it should be noted that the Deposition Subpoena may be fairly classified as an annoyance because of the manner in which it has forced Heritage Action to defend virtually the same issues that arose with respect to the Document Subpoena.

## <u>Conclusion</u>

The Deposition Subpoena is procedurally insufficient to compel Heritage Action's compliance. Even if it designated an appropriate place and provided for the administration of an oath by a suitable officer, Heritage Action's compliance would not meaningfully contribute to Plaintiffs' ability to prove their claims. The undue burden that the Deposition Subpoena imposes on Heritage Action warrants quashing the Deposition Subpoena and issuance of a protective order forbidding Plaintiffs from yet again pursuing Heritage Action for information that they already have or can seek elsewhere.

**[Remainder of page intentionally blank.]**

## CERTIFICATE IN ACCORDANCE WITH LOCAL RULE 7.0(m)

Undersigned counsel certifies that on November 1 and November 2, 2021, Heidi Abegg, one of the attorneys for Heritage Action conferred with Michael Fletcher, Esq., one of the attorneys for Plaintiffs, in a good faith effort to resolve the issues raised in this Motion, including attempts to limit the scope of the deposition, but they have been unable to reach agreement.

Dated: November 3, 2021

Respectfully submitted,

/s/ *Heidi K. Abegg*

Heidi K. Abegg (DC Bar No. 463935)
WEBSTER, CHAMBERLAIN & BEAN, LLP
1747 Pennsylvania Avenue, N.W.
Suite 1000
Washington, D.C. 20006
Telephone: (202) 785-9500
Telecopier: (202) 835-0243

*Attorney for Non-Party Heritage Action for America, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of November 2021, I caused a copy of this Motion to Quash, Memorandum in Support, and Proposed Order to be filed electronically with the Clerk of the Court by using the CM/ECF system and a true and correct copy of the same was served by United States Mail and electronic mail upon the following:

P. Benjamin Duke
Shira M. Poliak
Covington & Burling LLP
The New York Times Building 620
Eighth Avenue
New York, NY 10018
pbduke@cov.com

Robert D. Fram
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
rfram@cov.com

Michael Pernick
Morenike Fajana
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
mfajana@naacpldf.org

Michael A. Fletcher II
Benjamin L. Cavataro
Morgan E. Saunders
Elizabeth T. Fouhey
Covington & Burling LLP
850 Tenth Street, N.W.
Washington, DC 20001
bcavataro@cov.com
msaunders@cov.com
efouhey@cov.com
mfletcher@cov.com

Amia Trigg
Mahogane D. Reed
NAACP Legal Defense & Educational Fund, Inc.

700 14th Street NW, Ste. 600
Washington, DC 20005
atrigg@naacpldf.org

Nellie L. King
The Law Offices of Nellie L. King, P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
Nellie@CriminalDefenseFla.com

Mohammad O. Jazil
Gary V. Perko
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
5817 Dahlgren Trial
Tallahassee, FL 32312
mjazil@holtzmanvogel.com

Bradley R. McVay
Ashley E. Davis
Florida Department of State
R.A. Gray Building, Suite 100
500 South Bronough Street
Tallahassee, FL 32399
Brad.mcvay@dos.myflorida.com

/s/ *Heidi Abegg*
Heidi Abegg